UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL SETH MACIEL,<br><br>Petitioner,<br><br>v.<br><br>WILLIAM KNIPP, Warden,<br><br>Respondent. | No. 2:12-cv-1023 MCE AC<br><br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action proceeds on the first amended petition, ECF No. 34, which challenges petitioner's 2009 conviction for first degree murder and attempted burglary. Claims One through Four have been dismissed as untimely, ECF Nos. 50, 54, and respondent has answered Claims Five and Six, ECF No. 57. Petitioner did not file a traverse.

## BACKGROUND

I. Proceedings in the Trial Court

   A. Preliminary Proceedings

Petitioner and three others were charged in San Joaquin County with murder and related charges arising from a botched burglary that ended un a homicide. Petitioner plead not guilty and went to trial with codefendants Travis Leon Carter and Roy Thierry. A third co-defendant, Jaime Baro, accepted a plea deal in exchange for his testimony.

The Evidence Presented at Trial

The California Court of Appeal summarized the evidence as follows:

> In December 2007 (all unspecified calendar dates are to that year), Eugene Snyder (also known as "Bear") and his girlfriend, Reyna Ahumada, were leasing an apartment on Alturas Avenue in Stockton. Maciel was Snyder's best friend. Maciel and his girlfriend, Debbie Perez, shared the apartment; they lived in their own room and paid rent. Maciel and Snyder sold marijuana together; Snyder sold it out of the apartment and Maciel sold it on the street. They made enough money to break even, with enough left over to smoke for themselves.
>
> Sometime around Thanksgiving, Snyder and Maciel got into an argument. Snyder wanted Maciel to turn himself in on an outstanding warrant and serve jail time so he could get back on his feet and support his family. At the end of the argument, Snyder told Maciel to leave, and Maciel eventually left for a few days.
>
> As a result of the argument, Maciel was "mad" at Snyder. He told his girlfriend Perez he "wanted something to happen to Bear" (Snyder). He divulged to her that he was going to have Jaime Baro, who sometimes bought marijuana from him, do a "robbery" at Snyder's house.
>
> After leaving the apartment, Maciel planned to turn himself in and report to jail. Before he did so, however, he instructed Baro to break into the apartment and take Snyder's marijuana and cash. Maciel made Baro a copy of the key and told him to enter when Snyder was not home. Perez was supposed to let Baro know when Snyder was absent. Maciel told Baro that the marijuana and money would be in the top drawer of Snyder's bedroom dresser.
>
>> Fn. Baro was charged and faced a life sentence in connection with this case, but accepted a plea in exchange for his testimony. He gave several different versions of his instructions from Maciel, including the one recited above. Baro said that Maciel wanted him to "get his stuff back," meaning his (Maciel's) money and marijuana. On another occasion, Baro stated that Maciel wanted to get his marijuana back, because he had paid for it and Snyder was not giving it to him. Under cross-examination Baro conceded that after Maciel gave him the key, he (Baro) decided he would take "other property" from Snyder's residence and split it with Thierry, whom he enlisted as an accomplice. Baro, who was 16 years old at the time, admitted he was "a little out of control," was drinking alcohol, smoking marijuana, taking ecstasy pills, and using methamphetamine.
>
> A week before the shooting, Maciel came back to pick up some belongings before turning himself in to serve jail time. He entered jail on December 4.
>
> Baro enlisted Thierry (aka "Poppa"), who was dating Baro's sister, to help him carry out Maciel's plan. On December 10, the two men

2

went to Snyder's apartment, but left when they discovered that "people were home."

On December 11, Baro went alone to Snyder's apartment to warn Perez that she should leave. A short time later, Perez saw Baro on the street and told him she was going to her cousin's. Baro replied that was good, because "something was gonna happen to the house."

After leaving Perez, Baro went to a nearby apartment to get Thierry. Thierry brought along Carter, whom Baro had never met before. With Carter driving his girlfriend's car, the trio arrived at Snyder's apartment. Thierry and Carter got out and went up to the apartment, while Baro stayed in the car.

Snyder and Ahumada were inside the apartment cooking. There was a knock at the door. Someone asked for Maciel. Snyder replied that Maciel was not home. The person, who identified himself as "Tone," said he wanted to buy marijuana. Snyder partially opened the door and saw an African-American male he later identified as Carter, standing about eight feet from the door. Carter told him to lie down. Snyder noticed Carter was concealing something that might have been a gun. Snyder attempted to shut the door, but it bounced back. He then called Ahumada over to help.

Suddenly, multiple shots were fired through the door. Carter and Thierry fled and got in the car, with Baro driving. Baro, who had heard multiple gunshots, saw Carter put a square-shaped gun into his waistband. Thierry angrily asked Carter, "Why'd you do that?" Carter replied that he shot through the front door because Snyder had tried to close it.

Ahumada was taken to the emergency room with multiple injuries to her collarbone, kidney, liver and pancreas. She was released from the hospital on December 31, 2007, but was readmitted on January 6, 2008, with symptoms of fever and nausea. Ahumada died the next day due to complications from her gunshot wounds.

In a jailhouse interview, Maciel was asked if he could think of a reason for the shooting. He replied, "Maybe someone tried to jack him [Snyder] for his stash."

No defendant testified. Carter put on expert testimony questioning the reliability of eyewitness identification.

Lodged Doc. 20 (ECF No. 56-20) at 2-5.

B. <u>Outcome</u>

On October 8, 2009, the jury found petitioner guilty of first degree murder (Cal. Penal Code § 187(a)) and attempted first degree burglary (Cal. Penal Code §§ 664 & 459). He was sentenced to a determinate state prison term of three years and an indeterminate term of twenty-five years to life.

II. <u>Post-Conviction Proceedings</u>

A. <u>Direct Review</u>

Petitioner appealed his conviction to the California Court of Appeal, Third Appellate District. Lodged Doc. 16 (ECF No. 56-16). On October 26, 2011, that court corrected errors in the abstracts of judgment and stayed the determinate sentence, but otherwise affirmed the judgment. Lodged Doc. 20 (ECF No. 56-20). Petitioner then sought review of the Court of Appeal's decision in the California Supreme Court. Lodged Doc. 21 (ECF No. 56-21). The California Supreme Court denied the petition for review on January 25, 2012. Lodged Doc. 23 (ECF No. 56-23). Petitioner did not petition the United States Supreme Court for certiorari.

B. <u>State Collateral Review</u>

Petitioner submitted a state habeas petition to the San Joaquin County Superior Court on September 15, 2013.[1] Doc. 5, ECF No. 42.[2] The Superior Court denied the petition on December 17, 2013. Doc. 6, ECF No. 42. Petitioner then filed a petition for writ of habeas corpus to the California Court of Appeal, Third Appellate District on July 16, 2014. Doc. 7, ECF No. 42. The Court of Appeal denied this petition on July 24, 2014. Doc. 8, ECF No. 42.

Petitioner then submitted another petition for habeas corpus to the Superior Court of San Joaquin County on March 3, 2015. Doc. 9, ECF No. 42. On May 6, 2015, the Superior Court denied this petition. Doc. 10, ECF No. 42. Petitioner submitted another petition for writ of habeas corpus to the Court of Appeal, Third Appellate District on January 5, 2016. Doc. 11, ECF No. 42. The Court of Appeal denied this petition on January 28, 2016. Doc. 12, ECF No. 42. On February 26, 2016, petitioner filed a petition for writ of habeas corpus to the California Supreme Court. Doc. 13, ECF No. 42. The California Supreme Court denied this petition on May 11, 2016. Doc. 14, ECF No. 42.

////

---

[1] For any period during which petitioner was proceeding pro se, the filing date is determined based on the prison mailbox rule. <u>Houston v. Lack</u>, 487 U.S. 266, 276 (1988) (documents are considered filed at the time prisoner delivers them to prison authorities for mailing).
[2] The record of petitioner's state habeas proceedings was lodged in relation to respondent's motion to dismiss. ECF Nos. 41, 42.

C.      Federal Petition

The original petition in this case was filed on April 5, 2012, prior to any of petitioner's applications for state habeas relief. ECF No. 1. The case was then stayed pursuant to Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003), and petitioner was directed to proceed to exhaust state remedies. ECF Nos. 8, 14. After the stay was lifted, he filed a first amended petition for writ of habeas corpus on October 29, 2016. ECF No. 34. Respondent subsequently moved to dismiss Claims One through Four as untimely, ECF No. 41, and that motion was granted, ECF No. 54. Accordingly, the claims now before the court are Claims Five and Six. Id.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538

1  U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established

2  Federal law," but courts may look to circuit law "to ascertain whether…the particular point in

3  issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64

4  (2013).

5        A state court decision is "contrary to" clearly established federal law if the decision

6  "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

7  U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

8  court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

9  the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

10  was incorrect in the view of the federal habeas court; the state court decision must be objectively

11  unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

12        Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

13  Pinholster, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court

14  reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other

15  words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.

16  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is

17  confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d

18  724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims

19  summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a

20  state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

21  must determine what arguments or theories may have supported the state court's decision, and

22  subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 102.

## DISCUSSION

I.    Claim One: Improper Jury Instructions as to Burglary of Petitioner's Own Home

      A. Petitioner's Allegations and Pertinent State Court Record

26        Petitioner alleges that the trial court's instructions on burglary, theft, and felony-murder

27  were deficient and misleading, and failed to educate the jury on the law concerning alleged

28  burglary of one's own premises, alleged theft of jointly-owned property, and the role of the

6

"natural and probable consequences" doctrine on the facts of the case. ECF No. 34 at 28. As relevant to the claim, the jury was instructed with CALCRIM 400 and 401 (aiding and abetting), 540B (first degree felony-murder liability as an aider and abettor), 1700 (burglary), and 1800 (theft by larceny). ECF No. 34 at 29-33. Petitioner contends that the court should also have instructed, sua sponte, that under California law a defendant cannot burglarize his own home. Id. at 34 (citing People v. Gauze, 15 Cal.3d 709 (1975)). Because petitioner had a possessory right in the apartment, he maintains that he cannot have been guilty of burglary or felony-murder predicated on burglary. He alleges further that it was error for the trial court to instruct on theft without also explaining the significance of petitioner's ownership interest in the marijuana, which would defeat a theft conviction. Petitioner contends that these instructional errors violated his Sixth and Fourteenth Amendment rights. Id. at 36-37.

### B. The Clearly Established Federal Law

Claims of error in state jury instructions are generally matters of state law, and thus may not be considered on federal habeas review. See Gilmore v. Taylor, 508 U.S. 333, 343-44 (1993). Federal habeas relief is available only where instructional error violated due process by rendering the trial fundamentally unfair. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). Alleged instructional error "must be considered in the context of the instructions as a whole and the trial record." Id. at 72. In challenging the failure to give an instruction, a habeas petitioner faces an "especially heavy" burden because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

### C. The State Court's Ruling

This claim was raised on direct appeal. Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas review in this court. See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

The Court of Appeal ruled as follows:

> **A. Failure to Instruct on the *Gauze* Defense**
>
> The jury was instructed on the elements of burglary and robbery, on

aiding and abetting, on felony-murder based on accomplice liability, and on the elements of theft.

Relying on *Gauze, supra*, 15 Cal.3d 709, Maciel claims that while these instructions were correct as far as they went, they were inadequate because they did not convey to the jury the crucial concept that he could not be guilty of burglary if he had an unconditional right to enter the apartment. Second, the trial court should have, sua sponte, instructed the jury that Maciel could not be guilty of theft if his intent was only to retrieve his own property. We discuss these points separately.

**B. *Gauze* Instruction**

In *Gauze*, our Supreme Court held the defendant could not be convicted of burglary for entering his own apartment for the purpose of shooting his roommate. The court explained that since one of the primary purposes of the burglary statute was to protect against a trespassory intrusion into the home, no burglary can be perpetrated by one who has the absolute right to enter. (*Gauze, supra*, 15 Cal.3d at p. 714.)

"In the absence of a request for a particular instruction, a trial court's obligation to instruct on a particular defense arises '"only if [(1)] it appears that the defendant is relying on such a defense, or [(2)] if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."'" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148.)

We need not decide whether a *Gauze* instruction was a pinpoint instruction affecting an element of the burglary charge or an instruction on an affirmative defense to burglary, for in all criminal cases, "even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953; *People v. Earp* (1999) 20 Cal.4th 826, 885.)

The Attorney General claims a Gauze instruction was not required because Maciel did not "rely" on a possessory right defense and there was no substantial evidence that he had an unconditional right to enter the premises. The first assertion, stated without supporting citation to the record, is irrelevant, since a court's sua sponte duty to instruct arises so long as the instruction was not inconsistent with the defense and there was substantial evidence to support it. (*People v. Breverman* (1998) 19 Cal.4th 142, 157.)

As to the second point, the Attorney General is mistaken. There was indeed substantial evidence from which a jury could conclude that Maciel had an unconditional possessory right to enter the apartment.

Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We do not consider the credibility of witnesses in determining whether

8

there is substantial evidence. (*People v. Elize* (1999) 71 Cal.App.4th 605, 615.)

At the time of the shooting, Perez and Maciel were sharing the apartment with Snyder and Ahumada. They paid rent and had their own room. The rent for December was paid up and Perez continued to live in the apartment even after Maciel went to jail. Snyder testified that after he and Maciel got into the argument, Maciel went away for a few days, but Snyder never excluded him from the apartment, and Maciel was welcome to return as soon as he finished his jail sentence. Finally, since Maciel had his own key, he could enter the apartment at will.

All of that having been said, we conclude no instruction on *Gauze* was required under the facts of this case. *Gauze* is distinguishable because there the defendant personally entered premises to which he had an absolute possessory right. The rationale of *Gauze* is that a fundamental purpose of the burglary statute is the protection of the right of an occupant to peaceful possession of the premises against an intruder. (*Gauze, supra*, 15 Cal.3d at p. 715.) Where the defendant enters a building to which he already has an unconditional possessory right, the raison d'être for the offense is lacking. In the words of *Gauze*: "[W]e conclude that defendant cannot be guilty of burglarizing his own home. His entry into the apartment, even for a felonious purpose, invaded no possessory right of habitation; only the entry of an intruder could have done so. More importantly, defendant had an absolute right to enter the apartment. This right, unlike that of the store thief in [*People v.*] *Barry* [(1892) 94 Cal. 481], did not derive from an implied invitation to the public to enter for legal purposes. It was a personal right that could not be conditioned on the consent of defendant's roommates. Defendant could not be 'refused admission at the threshold' of his apartment, or be 'ejected from the premises after the entry was accomplished.' [Citation.] He could not, accordingly, commit a burglary in his own home." (*Gauze, supra*, 15 Cal.3d at p. 714.)

Unlike the defendant in *Gauze*, however, Maciel was not prosecuted for entering his own apartment with the intent to steal (which, of course, was physically impossible given his jail confinement at the time). Maciel's guilt on the charge of burglary depended solely on his status as Baro's accomplice. It was Baro's intent to enter the apartment with theft as the objective that made the conduct unlawful. And Baro, most certainly, had no possessory right to enter Snyder's apartment.

There was overwhelming evidence that Baro and his accomplices attempted to enter Snyder's apartment with a felonious purpose. As Maciel concedes, the jury was correctly instructed that, to be guilty on an aiding and abetting theory, the defendant must know of the perpetrator's intent to commit a crime, share that intent, and "aid, facilitate, promote, encourage, or instigate" the perpetrator's commission of the crime.

Thus, under the instructions given, in order to find Maciel guilty of attempted burglary, the jury had to find that (1) Baro intended to

enter the apartment with the intent to steal Snyder's property; (2) Maciel shared this intent; and (3) Maciel instigated, facilitated, or assisted Baro in that endeavor.

The fortuitous fact that Maciel aided Baro's larcenous intent by giving him a key to the apartment, did not preclude Maciel from being liable for attempted burglary. It was Baro who, through his confederates, attempted to enter a building to which he had no possessory right. It was his mental state that formed the predicate to attempted burglary. And if Maciel shared that intent and facilitated the act, Maciel could be found equally guilty of attempted burglary under an accomplice theory. (§ 31.)

We conclude that *Gauze* has no application where the sole theory of liability for burglary is aiding and abetting a felonious entry into a building by a perpetrator who has no occupancy rights. Our conclusion is consistent with the rationale underlying *Gauze*. As the Supreme Court put it, "In contrast to the usual burglary situation, no danger arises from the mere entry of a person into his own home, no matter what his intent is. He may cause a great deal of mischief once inside. But no emotional distress is suffered, no panic is engendered, and no violence necessarily erupts merely because he walks into his house. To impose sanctions for burglary would in effect punish him twice for the crime he committed while in the house. In such circumstances it serves no purpose to apply section 459." (*Gauze*, *supra*, 15 Cal.3d at pp. 715-716, italics added.)

By contrast, the entry into a home by one who has no right to enter poses all of the dangers cited in *Gauze*—dangers that, unfortunately, came to frightful realization in this case. Consequently, the imposition of liability upon Maciel for aiding Baro's unlawful attempted entry into the apartment is fully consistent with the legislative intent behind the burglary statute.

In sum, the principle that one cannot be guilty of burglarizing his own home was not one that was closely and openly connected to the jury's understanding of this case. A *Gauze* instruction was not necessary.

**C. Claim-of-right Defense**

Maciel claims there was substantial evidence that his intent in directing Baro to enter the property was either to retrieve property that was already his or property that he jointly owned with Snyder. For this reason, he argues that it was error for the trial court to instruct on theft without also "explaining the significance of [Maciel's] ownership interest in the marijuana."

This argument evokes the "claim-of-right" defense. (CALCRIM No. 1863.) As explained by the California Supreme Court, "a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938 (Tufunga).) Although, as the Attorney General points out, CALCRIM No. 1800 instructed the jury that, to

be guilty of theft, the defendant must take possession of property "owned by *someone else*" (italics added), the jury was never told that a defendant who takes property under a good faith belief that he owns it cannot be guilty of robbery or theft.

Where it appears a defendant is relying on a claim-of-right defense, or there is substantial evidence to support such a defense, the trial court has a duty to instruct the jury on that defense sua sponte. (*People v. Creath* (1995) 31 Cal.App.4th 312, 319; *People v. Stewart* (1976) 16 Cal.3d 133, 140-142.) The instruction must be given where there is substantial evidence "to support an inference that the defendant '"acted with a subjective belief [that] he or she had a lawful claim on the property."'" (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1429-1430, quoting *People v. Barnett* (1998) 17 Cal.4th 1044, 1145, italics omitted.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

As indicated in footnote 3, *ante*,[3] Baro's conflicting testimony about Maciel's instructions to him could give rise to an inference that Maciel asked Baro to retrieve property he believed was rightfully his. During his testimony Baro said that Maciel told him he wanted to "get *his stuff* back." (Italics added.) At another point, Baro said Maciel sent him to retrieve his (Maciel's) money and marijuana. Still later, Baro testified that Maciel said he wanted to retrieve his marijuana, because he had paid for it and "Bear [Snyder] was not giving it back to him." In light of the principle that "[d]oubts as to the sufficiency of the evidence to warrant the instruction [must] be resolved in favor of the accused," we conclude there was sufficient evidence to justify an instruction on the claim-of-right defense. (*Tufunga, supra*, 21 Cal.4th at p. 944.)

The California Supreme Court has "not yet determined what test of prejudice applies to the failure to instruct on an affirmative defense." (*People v. Salas* (2006) 37 Cal.4th 967, 984.) We need not resolve that issue, for we find that the failure to instruct was harmless under either a *Watson* or a *Chapman* standard. (*See People v. Williams* (2009) 176 Cal.App.4th 1521, 1530 (*Williams*).)

First of all, this was not a typical claim-of-right case, where the defendant testifies that his intent was to seize or reclaim his own property. The only issue for the jury was which portion of Baro's testimony to believe: Did Maciel tell Baro to get his marijuana (and money) back, or did he instruct Baro to take Snyder's weed and cash? On this point, compelling evidence pointed to the latter version.

Maciel's recruitment of Baro occurred immediately after an argument between Maciel and Snyder, an argument so intense that Maciel left the apartment for several days. Maciel's girlfriend Perez testified that Maciel was "mad" at Snyder. Maciel told her that he wanted someone to "fight" Snyder, that something was going to happen to Snyder and, finally, that Baro was going to do a "robbery"

---

[3] <u>See</u> summary of evidence at page 2 of these Findings and Recommendations.

of Snyder because he did not want Snyder to have any marijuana. Maciel copied a key for Baro and instructed him to enter when Snyder was not home. Maciel told Baro that the marijuana and cash would be found in Snyder's bedroom dresser. Perez was supposed to alert Baro when Snyder was away and Baro warned Perez to leave just prior to the attempted entry because "something was going to happen to the house." The plot was hatched just before Maciel voluntarily turned himself in to serve a jail sentence. Finally, when the police asked Maciel if he could think of a motive for the crime, he replied, "Maybe someone tried to jack [Snyder] for his stash."

Given this mosaic of evidence, it was highly implausible that a jury given the omitted instruction would have concluded that Maciel enlisted Baro for the mundane purpose of retrieving his own property. After all, Perez was still residing in the apartment and was readily available to retrieve any of Maciel's property without incident. The evidence clearly showed that Maciel had a grudge against Snyder and wanted to punish him. Maciel could not achieve this objective by merely hiring a casual acquaintance to retrieve his own property.

Moreover, although she did not use the term of art, Maciel's counsel highlighted the claim-of-right defense in her closing argument. She reminded the jury that Baro testified that "my client [Maciel] asked him to go in and get *his* marijuana when nobody was home, using *his* key." (Italics added.) She continued, "The attempted burglary. Again, if you believe Jaime Baro, what did my client ask him to do? Get his own marijuana. [¶] The section [sic] requires that you enter with the intention of committing a theft. And you will look at the . . . jury instruction that defines that. Is that a crime, to have someone go in and get your own marijuana? No." (Italics added.)

In rebuttal, the prosecutor sarcastically belittled this argument: "My marijuana. My marijuana. My marijuana. My marijuana happens to be in Eugene Snyder's drawer and instead of asking my girlfriend to get it I'm going to come up with a plan to burglarize it."

Under the instructions given, the jury had to find that, in order to be guilty of theft, it must be proven that the defendant intended to take property "owned by someone else." By finding Maciel guilty of attempted burglary, the jury necessarily rejected the idea that Maciel intended that Baro obtain property that already belonged to Maciel.

Our review of the evidence, the arguments of counsel and the jury's verdict convince us that any failure to give instructions pertaining to a claim-of-right defense was harmless beyond a reasonable doubt. (*Williams, supra*, 176 Cal.App.4th at p. 1531.)

Lodged Doc. 20 (ECF No. 56-20 at 6-16.

### D. Objective Reasonableness Under § 2254(d)

The state court denied petitioner's claims of instructional error on state law grounds, without express reference to petitioner's assertion of federal constitutional violations. As to the

12

burglary instructions, the Court of Appeal held as a matter of California law that "*Gauze* has no application where the sole theory of liability for burglary is aiding and abetting a felonious entry into a building by a perpetrator who has no occupancy rights." Lodged Doc. 20 (ECF No. 56-20) at 10. That holding is unreviewable here. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). And because the jury was correctly instructed under California law, there can have been no fundamental unfairness within the meaning of federal due process jurisprudence. Even if a pinpoint instruction is proper as a matter of state law, the failure to give it does not without more support federal habeas relief. See Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).

No U.S. Supreme Court precedent holds that a defendant has a constitutional right to an instruction like the one petitioner urges here, or indicates any constitutional bar to a felony-murder conviction predicated on aiding and abetting the burglary of one's own home by another. Absent such authority, there can be no relief under § 2254. See Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam) (where no Supreme Court precedent that controls a legal issue raised by a habeas petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law).

As to the "claim of right" instruction regarding the marijuana, the state court found error but held that it was harmless beyond a reasonable doubt. This is the standard that applies to errors of constitutional dimension. See Chapman v. California, 386 U.S. 18 (1967). Although the state court did not find a constitutional violation, it found the Chapman standard satisfied. Accordingly, federal habeas relief is available only if the state court's harmless error finding was itself objectively unreasonable. Fry v. Pliler, 551 U.S.112, 119 (2007). There is no basis for such a conclusion here. The state court's evaluation of the evidence was thoroughly and carefully reasoned. The court found both that (1) the state of the evidence would not have supported a jury finding that petitioner had actually intended only to get his own property back, and (2) that the instructions and arguments presented to the jurors adequately permitted them to consider the

13

question for themselves.  Neither conclusion is unreasonable on the facts of this case, and each of them independently provides a reasonable basis for the harmless error determination.

For these reasons, federal habeas relief is unavailable.

II.   Claim Two: Ineffective Assistance of Counsel

A.   Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that trial counsel was ineffective for failing to request the jury instructions at issue on Claim One, and to thus ensure that the jury "understood all of the legal principles on which Mr. Maciel's guilt or innocence would turn."  ECF No. 34 at 39.

B.   The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 692, 694 (1984).  Prejudice means that the error actually had an adverse effect on the defense.  There must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  Id. at 693-94.  The court need not address both prongs of the Strickland test if the petitioner's showing is insufficient as to one prong.  Id. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

C.   The State Court's Ruling

This claim was exhausted on direct appeal, so the decision of the intermediate appellate court is subject to review here.  Ortiz, 704 F.3d at 1034.  Because the issue is not expressly addressed in the Court of Appeal's opinion, Lodged Doc. 20, the undersigned treats it as an unexplained denial on the merits.  Accordingly, this court asks whether there is any reasonable basis in clearly established federal law for the state court's decision.  Richter, 562 U.S. at 102.

D.   Objective Reasonableness Under § 2254(d)

Because there was no error in the trial court's failure to give a Gauze instruction, counsel cannot have been performing deficiently in failing to propose one.  And because any such request would have been denied for the reasons explained by the California Court of Appeal, petitioner

also cannot establish prejudice within the meaning of Strickland.

As to the "claim of right" issue, the Court of Appeal's harmless error finding as to the failure to instruct—which is not unreasonable and therefore cannot be disturbed—defeats a showing of Strickland prejudice. For all the same reasons that the failure to instruct was harmless beyond a reasonable doubt, there is no reasonable probability of a different result had counsel sought and obtained the instruction.

For these reasons, summary denial of petitioner's ineffective assistance of counsel claim was not objectively unreasonable. Federal habeas relief is unavailable.

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. See 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 23, 2024

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

15